FILED

2024 Jun-11  AM 10:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

DANA RAVIZEE, individually and on
behalf of all others similarly situated,

               Plaintiff,

      - against -                      Class Action Complaint

BLUE DIAMOND GROWERS,

               Defendant.         Jury Trial Demanded

Dana Ravizee ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    Up until the late 1800s, consumers filled their own bottles and sacks in bulk at the local dry goods or general store.

2.    The frauds encountered by such shoppers related primarily to weights and measures, such as whether a scale was zeroed out, or a "thumb on the scale," resulting in a loss to the consumer.

3.    Increasing urbanization, new technologies, and changes in society, contributed to new kinds of fraud, based on the individual packaging of goods.

4.    Instead of being captive to the weights and measures of the immediate seller, consumers now faced unscrupulous and distant packers, selling "short weight" containers.

5.    This practice encompassed labeling which promised a particular amount, weight, or quantity, but delivered significantly less.

6.    To protect the marketplace and consumers, Congress amended the Pure Food and Drug Act to require "the quantity of the contents be [] plainly and conspicuously marked on the outside of the package in terms of weight, measure or numerical count." 21 U.S.C. § 8; 37 U.S. Stat. 732 (1913) ("Gould Amendment")

7.    Manufacturers quickly realized that roughly 80 percent of consumers did not look at such quantitative information.

8.    Even if they did, it was of little significance unless they knew the specific gravity and density of the items they were buying.

9.    In fact, the average consumer spends 13 seconds deciding which product to purchase.

10.    To circumvent these new laws, companies utilized packaging that created the appearance of a greater quantity and/or numerical amount, notwithstanding any accurate declarations of net weight.

11.    Since "consumers initially [] rely on extrinsic cues" like the size of packaging, and develop expectations as to the amount of product it contains, it is not surprising that research has confirmed their preferences for larger sizes.[1]

---

[1] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016):

12.   That package size is the predominant factor in purchase decisions is supported by studies indicating that ninety percent of consumers rely exclusively on visually examining a container's size, without touch or other senses.

13.   As "Packages [] replaced the salesman," so did the proliferation of containers used to conceal the amount of unfilled space, beyond what was necessary for functional and technological reasons.

14.   This non-functional slack fill took increasingly creative forms, such as false bottoms, thickened glass, or most simply, an oversized package, which conveyed to the consumer they would receive an amount of product bearing a reasonable relation to the size of its container.

---

219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013; Clement, J., Visual Influence on In-Store Buying Decisions: An Eye-Track Experiment on the Visual Influence of Packaging Design, Journal of Marketing Management, 23, 917-928 (2007); Gupta K, O. et al., Package Downsizing: Is it Ethical? 21 AI & Society 239-250 (2007).



Some of the ways the housewife is imposed upon because the Federal Food and Drugs Act does not prohibit deceptive packages or slack-filling. (Reproduction from a Government exhibit.)

15. Congress, state legislatures, and public interest groups, knew that these "deceptive methods of filling…where the package is only partly filled [] despite the declaration of quantity of contents on the label, created the impression that it contains more food than it does," harming consumers financially.

16. To protect consumers from these new "misbranding"[2] practices, the Federal Food, Drug and Cosmetic Act ("FFDCA") prohibited "container[s] [] so made, formed, or filled as to be misleading," the Federal Food, Drug and Cosmetic Act ("FFDCA"). 21 U.S.C. § 343(d).

17. These rules required that "information set forth on [] packages be sufficiently adequate to apprise the consumer of their contents and to enable the

---

[2] "Misbranding" is the statutory term used for conduct that misleads consumers.

4

purchaser to make value comparisons among comparable products."

18.    This State adopted these rules through the Alabama Food and Drug Act, Code of 1940, Tit. 2, Ch. 1, Article 18, § 304 *et seq*., followed by the Alabama Safe Foods Act of 2000, and accompanying regulations. Ala. Code § 20-1-1 *et seq*.; Ala. Admin. Code r. 420-3-20-.02 ("Adoption By Reference" of Title 21, Code of Federal Regulations ("C.F.R."), Parts 1 through 190, for the packaging and labeling of food).

19.    Though the newly established Food and Drug Administration ("FDA") developed rules to curtail deceptively packaged foods, the Federal Trade Commission ("FTC") and the Fair Packaging and Labeling Act ("FPLA") applied these principles to the wider marketplace, because "Packages and their labels should enable consumers to obtain accurate information as to the quantity of the contents." 15 U.S.C. § 1451 *et seq*.

20.    To appeal to consumers seeking the greatest value for their money, Blue Diamond Growers ("Defendant") sells almond and rice cheddar cheese flavored crackers in cardboard boxes ("Product") with a presumably accurate "net weight" of 4.25 oz (120.5g).



21. Consumers will expect the quantity of crackers to bear a reasonable relation to the package's large size of 7 $^3/_8$ (7.375) inches tall, 5 $^{11}/_{16}$ (5.6875) inches wide, and 2 $^5/_{16}$ (2.3125) inches deep.



6



22.   However, the Product is "misbranded" because "its container is so made, formed, or filled as to be misleading," since (1) its "[opaque cardboard] container [] does not allow the consumer to fully view its contents," and (2) it consists of "[sixty percent] empty space…for reasons other than" those specifically authorized. 21 C.F.R. § 100.100 citing 21 U.S.C. § 343(d); 21 C.F.R. § 100.100(a); Ala. Admin. Code r. 420-3-20-.02(1) (adopting 21 C.F.R. Part 101).






23.   That the packages contain only 39.8% crackers was concluded by measuring the level to which the crackers were filled, 2 $^{15}/_{16}$ (2.9375) inches, and dividing this by the box's height of 7 $^{3}/_{8}$ (7.375) inches.

24.   The relatively small amount of crackers has been noticed by purchasers of the cheddar cheese and other varieties, which are packaged and labeled similarly.

25.   For example, though "T.Rowe.23" complimented the taste, she observed that "the amount of product is small. Def not shareable."



26.   Another buyer wrote how he was "very disappointed. I paid almost $4 for this box of crackers. it was a tiny little box with barely a handful of crackers in it and I paid $4 for this. I feel like I've been ripped off…I could have bought a large box of nabisco's wheat thins," a competitor brand of crackers.



★☆☆☆☆                                    3/24/2023

I'm very disappointed. I paid almost $4 for this box of
crackers. it was a tiny little box with barely a handful of
crackers in it and I paid $4 for this. I feel like I've been ripped
off. the crackers don't taste any better than most crackers
do and certainly not that price it's not justified. but the same
price I could have bought a large box of nabisco's wheat
thins which always taste good.

David

27.    "Donna" remarked there were "very few in the box that I thought it was
empty. Very overpriced. Waste of money."



★☆☆☆☆ Verified Purchase ⓘ                3/14/2024

**Very bland and very few in box!**

No taste at all to these crackers. So few in the box that I
thought it was empty. Very overpriced. Waste of money.

Donna

👍 0    👎 0    ⚐

28.    The "Duke of Earl" agreed, commenting that there was "Too small a
quantity for the high price."



★★☆☆☆ Verified Purchase ⓘ                1/3/2021

Too small a quantity for the high price.

DukeofEarl

👍 0    👎 0    ⚐

10

29.   Another buyer, "SS," remarked that there were "Not many crackers compared to box size," and how she was "Disappointed by amount of air in the package."




30.   "Judy" shared that while she "Love[s] these," there is "not much in the package which makes them pricey."



31. "Wendy" agreed, saying they are a "Good product with very little in the box and only a decent buy if on sale."



32. "Suzy" from Dallas, Texas, bought the similarly packaged and labeled "'Multi-Seed Almonds' Nut Thins," complaining that there were "Not Enough Crackers In The Bag," and that "the package had very little crackers in it. Not fair to the customer that is paying high dollar for these crackers. Will not buy for a while until the sack in the box is at least half full!"



33. Though federal and identical state regulations allow excess space or slack-fill, none apply to Defendant's crackers. 21 C.F.R. § 100.100.

34.   First, the "Protection of the contents of the package" does not require more than 60% empty space to be protected from damage. 21 C.F.R. § 100.100(a)(1).

35.   Though the box resembles a set of matryoshkas, or "wooden dolls of decreasing size placed one inside another," its oversized interior foil pack does not prevent the crackers from being crushed when the consumer opens it up, whether purchased from brick-and-mortar stores or online.



36.   This is confirmed by the numerous reports from purchasers.

37.   For instance, though "Patricia" posted her comments to Amazon.com, her review focused on her experiences buying the crackers in-person, describing how she "tried several stores and have been finding that about half the package is crushed pieces," titling her review, "Is there a packaging problem?," because she "really

would like the whole cracker at lease less crushed pieces."



**Patricia** · 2 years ago

**Is there a packaging problem?**

Is anyone else having the same problem I am .... I really enjoy the Pecan Nutthins ... they are my favorite ... however, I have tried several stores and have been finding that about half the package is crushed pieces ... I don't mind the half pieces too much, but I really would like the whole cracker at lease less crushed pieces.

**I consume this product:** Every day

38.    Verified Purchaser "Wendy" was upset about "Crushed crackers," due

to a "Terrible packing job. Crackers were crushed to crumbs."



★☆☆☆☆  Verified Purchase ⓘ                     9/16/2020

**Crushed crackers**

Terrible packing job. Crackers were crushed to crumbs.

Wendy

👍 0    👎 0    ⚐

39.    "Tiffany" also complained how the crackers "come crushed."



★★★☆☆  Verified Purchase ⓘ                     10/4/2020

**Expensive but good!**

It's just so expensive! I like that it has less calories then regular crackers.. but honestly I can't always afford a lot of food so instead I would rather cook up some rice and crush almonds on top and eat that with salt. Hahahaha! Cause that's what these are. As a snack. These aren't something I'd always buy. They come crushed anyways and Walmart forgot to ship a box last time too. So that's not fun.

Tiffany

👍 0    👎 0    ⚐

40.   "LoLoD" bought the cheddar variety, and it did not appear that the interior foil bag or box prevented her from receiving a package that "was [not] smashed with broken chips" and "Totally smashed boxed and chips were in pieces."





41.   "Kelly Hilmann" offered proof that the interior foil bag and outer cardboard box were insufficient to prevent "Many many broken pieces," displaying the crushed contents in a green bowl.



42.   In the experience of "Nikki Ryan," who bought the cheddar variety like

Plaintiff, the foil bag and outer box did not prevent a "Smashed box! [and] Smashed

crumbled product!," where the "nut thins [we]re crumbs."



43.   This   was   similar   to   what   "cherlyc"   encountered,   who   was   "very

disappointed []   that   [she]   could   not   get   [her]   damaged   product   returned,"   who

confirmed the foil bag and cardboard box did not prevent her from receiving "cracker pieces" instead of whole crackers.



44.    Second, "requirements of the machines used for enclosing the contents [of the] package" do not require more than 60% of empty space. 21 C.F.R. § 100.100(a)(2).

45.    Upon information and belief, without having the opportunity to review Defendant's machinery, the equipment used to manufacture and seal the interior foil bags is capable of preventing excess air.

46.    Upon information and belief, without having the opportunity to review Defendant's machinery, the equipment used to manufacture and seal the boxes does not breach the inside the boxes during the packaging process.

47.    Neither the hot glue, the remnants of which are depicted on the large

flaps below, nor the sealing equipment, requires a substantial amount of slack-fill in the box during the manufacturing and packaging processes.



48.   Additionally, the packaging machines can be configured to fill the box with more crackers.

49.   Third, there is no "Unavoidable product settling during shipping and handling," because given the crackers' density, shape, and composition, any settling occurs immediately at the point of filling the box, if at all. 21 C.F.R. § 100.100(3).

50.   Fourth, there is no "need for the package to perform a specific function." 21 C.F.R. § 100.100(4).

51.   Unlike a ready-to-eat container of soup, where the consumer will add water to an already filled cup, this packaging's sole purpose is to hold the interior foil bag with crackers.

52.   Purchasers of the crackers remove them out of the interior foil bag to their mouth, for consumption.

53.   The crackers are not prepared or consumed in the cardboard packaging box.

54.   Fifth, the crackers are not "packaged in a reusable container where the container is part of the presentation of the food and [does not] ha[ve] value which is both significant in proportion to the value of the product and independent of its function to hold the food." 21 C.F.R. § 100.100(5).

55.   Unlike "a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed," like a gift basket filled with fruits, jams, and crackers, the interior foil bag and cardboard box are not "intended for further use after the food is consumed." 21 C.F.R. § 100.100(5).

56.   Nor does the interior foil bag have the ability to be sealed after opening.

57.   Neither the interior foil bag or the cardboard box is a "durable commemorative or promotional package[]," celebrating any event or promoting anything other than its ability to hold the crackers.

58.   Additionally, the interior foil bag and the cardboard box are not part of the presentation of the crackers to the consumer, like a Valentine's Day box of candy, in the shape of a heart.

59.   Sixth, there is no "Inability to increase [the] level of fill or to further

reduce the size of the package." 21 C.F.R. § 100.100(6).

60. Indeed, Defendant should be able to double or possibly triple the product in each box.

61. All "required food labeling" can be presented on a smaller package in similar size fonts.

62. There are no reports that the size of the box "discourage[s] pilfering."

63. A smaller or more filled box would just as easily "facilitate handing."

64. The box has no "tamper-resistant devices" such that a smaller box or increased fill level would not be a factor.

65. Smaller packaging would provide space for the contents and save money on packaging materials.

66. Defendant could readily reduce the size of the box or increase the fill level and eliminate and/or minimize deception.

67. As a result of the false and misleading representations, comparisons, and omissions identified here, the Product is sold at a premium price, at or around $4.29 for 4.25 oz (120.5g), excluding tax and sales, higher than similar products, represented in a non-misleading way, and/or higher than it would be sold for absent the misleading representations, comparisons, and/or omissions.

## JURISDICTION

68. Jurisdiction is based on the Class Action Fairness Act of 2005

("CAFA"). 28 U.S.C. § 1332(d)(2).

69.   The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

70.   Plaintiff is a citizen of Alabama.

71.   Defendant is a citizen of California.

72.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

73.   The Court has jurisdiction over Defendant because it transacts business within Alabama and sells the Product to consumers within Alabama from grocery stores, big box stores, drug stores, warehouse club stores, independent retail stores, convenience stores, bodegas, and/or other similar locations, in this State and/or online, to citizens of this State.

74.   Defendant transacts business in Alabama, through the sale of the Product to citizens of Alabama, from grocery stores, big box stores, drug stores, warehouse club stores, independent retail stores, convenience stores, bodegas, and/or other similar locations, in this State and/or online, to citizens of this State.

75.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

76.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers

within this State by misleading them as to its contents, likeness, quantity, attributes, type, origins, amount, other versions, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

77.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, likeness, features, quantity, attributes, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State, and derives substantial revenue from interstate or international commerce.

## VENUE

78.   Plaintiff resides in Greene County, Alabama.

79.   Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff's claims occurred in Greene County, Alabama.

80.   Venue is in this Court because Plaintiff's residence is in Greene County, Alabama.

81.   Plaintiff purchased, used, consumed, and/or applied the Product in reliance on the packaging, labeling, representations, comparisons, and/or omissions,

identified here, in Greene County, Alabama, and/or other areas.

82.   Plaintiff first became aware the packaging, labeling, representations, comparisons, and/or omissions, were false and misleading, in Greene County, Alabama.

## PARTIES

83.   Plaintiff is a citizen of Greene County, Alabama.

84.   Defendant is a California agricultural cooperative with a principal place of business in California.

85.   Defendant is the largest cooperative of almond growers in the world.

86.   Defendant sells various kinds of almond products.

87.   Defendant manufactures, markets, and sells its crackers, including the Product identified here, in various flavors and varieties, with uniform representations and packaging.

88.   Plaintiff is like most consumers, who prefer more of something, especially food they are buying, than less, for reasons including value.

89.   Plaintiff and consumers observed and relied on the size of the packaging to expect it would contain more of the crackers than it did and that the contents would be greater than they were.

90.   Plaintiff relied on the omissions which failed to tell her that the Product consisted of more than 60% empty space and less than 40% crackers.

91.   Plaintiff did not expect the Product she bought would consist of more than 60% empty space and less than 40% crackers.

92.   Plaintiff expected the Product to contain more of the crackers than it did and that the contents would be greater than they were, and did not expect to buy a Product that consisted of more than 60% empty space and less than 40% crackers.

93.   Plaintiff purchased the Product between June 2023 and May 2024, at grocery stores, big box stores, drug stores, warehouse club stores, independent retail stores, convenience stores, bodegas, and/or other similar locations, in Alabama, and/or other areas.

94.   Plaintiff bought the Product at or around the above-referenced price.

95.   Plaintiff paid more for the Product than she would have had she known it consisted of more than 60% empty space, and less than 40% crackers, as she would not have bought it or would have paid less.

96.   The Product was worth less than what Plaintiff paid, and she would not have paid as much, absent Defendant's false and misleading packaging, statements, omissions and/or comparisons.

97.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their quantities, packaging, attributes, features, and/or components, relative to themselves and other similar versions or products.

## CLASS ALLEGATIONS

98.   Plaintiff seeks to represent the following class:

> All persons in Alabama who purchased the
> Product in Alabama during the statutes of
> limitations for each cause of action alleged,
> expecting it to contain more of the crackers
> than it did and that the contents would be
> greater than they were.

99.   Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, members, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

100. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

101. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

102. Plaintiff is an adequate representative because her interests do not conflict with other members.

103. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

104. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

105. The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at grocery stores, big box stores, drug stores, warehouse club stores, independent retail stores, convenience stores, bodegas, and/or other similar locations, in this State and/or online, to citizens of this State.

106. Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequate and fairly.

## CAUSES OF ACTION

### COUNT I
Alabama Deceptive Trade Practices Act ("ADTPA"),
Ala. Code § 8-19-1, *et seq.*

107. Plaintiff incorporates by reference paragraphs 1-67.[3]

108. The purpose of the ADTPA is to protect consumers against unfair and deceptive practices. Ala. Code § 8-19-2.

109. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

110. The ADTPA considers false advertising, unfair acts, and deceptive

---

[3] To the extent any incorporation by reference is required.

practices in the conduct of any trade or commerce to be unlawful.

111. Violations of the ADTPA can be based on other laws and standards related to consumer deception.

112. Violations of the ADTPA can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

113. An ADTPA violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

114. An ADTPA violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

115. Violations of the ADTPA can be based on public policy, established by norms, customs, statutes, law, or regulations.

116. An ADTPA violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

117. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations," including likeness to other

similar products. 15 U.S.C. § 55(a)(1).

118. In considering whether the labeling and/or packaging of food products is misleading, it is required to consider not only representations made or suggested by packaging, statements, images, and/or design, but also the extent to which this fails to prominently and conspicuously reveal facts relative to (1) the proportions or absence of the item being bought, certain ingredients, features, and/or attributes, and/or (2) other facts concerning its quantity, attributes and/or characteristics, such as ingredients, quantity, size, amount, origin, type, and/or quality, which are of material interest to consumers.

119. Defendant's false, misleading, and deceptive representations and omissions, and comparisons, with respect to the Product's contents, attributes, features, origins, amount, quantity, ingredients, comparisons, and/or quality, that it would contain more of the crackers than it did, and that the contents would be greater than they were, are material in that they are likely to influence consumer purchasing decisions.

120. This is because consumers prefer to buy foods which contain more of the specified food, than less.

121. The Product could have included more crackers and/or decreased the size of the packaging, but failed to do these things because they would have cost more.

122. The labeling of the Product violated the FTC Act and thereby violated

the ADTPA, because the representations, omissions, packaging, labeling, and/or comparisons, created the erroneous impression it contained more of the crackers than it did, and that the contents would be greater than they were, when this was false, because it consisted of more than 60% empty space and less than 40% crackers.

123. The labeling, marketing, and comparisons of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, immoral, and/or unconscionable acts or practices, intended to protect the public, thereby violating the ADTPA.

124. The labeling of the Product violated the ADTPA because the representations, omissions, labeling, packaging, and/or comparisons, that the Product would contain more of the crackers than it did and that the contents would be greater than they were, was unfair and deceptive to consumers.

125. The labeling of the Product violated the ADTPA because the representations, omissions, packaging, labeling, and comparisons, that the Product would contain more of the crackers than it did and that the contents would be greater than they were, was contrary to the Alabama Safe Foods Act of 2000, which adopted, where applicable, other laws and regulations.

| Federal | State |
|---|---|
| 21 U.S.C. § 343(d) | |
| 21 C.F.R. § 100.100 | Ala. Admin. Code r. 420-3-20-.02(1) |
| 21 C.F.R. § 100.100(a) | |

126. Plaintiff believed the Product would contain more of the crackers than it did and that the contents would be greater than they were, and did not expect to buy a Product that consisted of more than 60% empty space, and less than 40% crackers.

127. Plaintiff paid more for the Product and would not have paid as much if she knew that it consisted of more than 60% empty space, and less than 40% crackers.

128.  Plaintiff seeks to recover for economic injury, financial damages, and/or economic loss she sustained, based on the misleading labeling, packaging, and/or comparisons of the Product, a deceptive practice under the ADTPA.

129. Plaintiff will produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, labeling, and comparisons, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and/or other advanced methodologies.

130. As a result of Defendant's misrepresentations, omissions, and/or comparisons, Plaintiff was injured and suffered economic and financial damages by

payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, comparisons, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, comparisons, and/or marketing identified here.

## <u>JURY DEMAND AND PRAYER FOR RELIEF</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   June 10, 2024

Respectfully submitted,

/s/ Charles M. Thompson
Charles M. Thompson, Esq. THO019
ASB-6966-P77C
Charles M. Thompson, P.C.
101 Mohawk Drive
Trussville, AL 35173
Tel: (205) 995-0068
Fax: (866) 610-1650
Email:  cmtlaw316@gmail.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Charles M. Thompson

Charles M. Thompson, P.C.

*Counsel for Plaintiff*

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

/s/ *Charles M. Thompson*
Charles M. Thompson
Counsel for Plaintiff

**SERVE DEFENDANT via certified mail at the following:**
(to be added before filing in Court)

**Certificate of Service**

I certify that on June 10, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | Electronic Filing | Certified and/or First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Charles M. Thompson